# STATE OF MICHIGAN

# COURT OF APPEALS

DEBORAH F. SILVERMAN,

      Plaintiff-Appellee/Cross-Appellant,

v

GEOFFREY L. SILVERMAN,

      Defendant-Appellant/Cross-Appellee.

UNPUBLISHED
August 9, 2018

No. 336905
Oakland Circuit Court
LC No. 2015-833487-DO

Before: RIORDAN, P.J., and K. F. KELLY and BOONSTRA, JJ.

PER CURIAM.

In this divorce action, defendant appeals as of right and plaintiff cross-appeals as of right the judgment of divorce issued after a bench trial. Previously, the trial court granted defendant's motion for partial summary disposition and denied plaintiff's motion for summary disposition. Those decisions by the trial court are now being challenged on appeal. We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

Plaintiff and defendant were married in 2003. They each had children from previous marriages, but had no children with one another. Before the wedding, plaintiff suggested that the parties enter into a prenuptial agreement. Plaintiff's sister and attorney drafted the agreement, defendant, who also is an attorney made some edits, and the parties signed it. The prenuptial agreement contained relevant portions regarding the assets each party had prior to their entry into marriage, how assets would be considered separate and marital in case of divorce, and the manner of distribution of those assets.

Throughout the course of the marriage, defendant supported the couple by paying all of the household and marital bills with his income from Silverman & Morris, PLLC. Defendant was a majority shareholder in the firm and took distributions from it as income. Defendant used some of the income to pay the marital bills and put other portions of it in separate investment, retirement, and bank accounts. Plaintiff's daughter, Taylor Yendick, lived with them and was receiving social security benefits after her father's death. That money was placed in a bank account at Bank of America, hereinafter the "Taylor Account," as the years passed. After moving twice, the parties' settled into a home in Bloomfield Hills in 2011. Plaintiff testified that she invested $125,000 for the down payment and for home renovations.

-1-

Beginning in 2014, defendant had an affair with an ex-girlfriend. Defendant decided to leave the marriage in 2015, and before doing so he leased and furnished an apartment. When the parties could not agree on how much money defendant was required to give plaintiff for her support, plaintiff filed for divorce, seeking an equitable distribution of the estate under the terms of the prenuptial agreement, spousal support, and attorney fees.

Defendant moved for partial summary disposition on the issue of his separate assets. Defendant contended that the prenuptial agreement provided that his investment, retirement, and bank accounts were his separate property. Plaintiff countered that summary disposition was required in her favor because the prenuptial agreement did not contemplate that defendant would invest a great deal of his earned income in those accounts and then call them separate assets. The trial court granted summary disposition in his favor.

The case eventually went to a bench trial largely focused on distribution of the marital assets, spousal support, and attorney fees. In regard to the marital estate, defendant argued that certain pieces of art—photographs by Peter Lik—were his separate property under the prenuptial agreement, and that the equity in the marital home, the Taylor Account, and the furniture and furnishings inside the marital home were marital assets. Defendant asserted that the trial court was required to distribute the marital assets as equally as possible. Plaintiff urged the trial court to determine that the Lik photographs were marital assets because they were hung in the marital home, the Taylor Account was her separate asset because it contained only funds meant for Taylor, and to distribute all of the marital assets equitably, in light of the circumstances of the case.

The trial took place over the course of 15 days over an extended span of around eight months. The trial court issued the judgment of divorce largely adopting the reasoning and argument of plaintiff, awarding her the entire house, the Taylor Account, three of the five Lik photographs, half of the valuable sports memorabilia and luggage still in the marital home, and all of the furniture and furnishings therein. The trial court also ordered defendant to pay $10,000 per month in spousal support and all of plaintiff's attorney and expert witness fees. This appeal followed.

## II. SUMMARY DISPOSITION

Plaintiff argues that the trial court committed error requiring reversal by granting defendant's, and denying her, motion for summary disposition because the trial court misinterpreted the prenuptial agreement. We disagree.

## A. STANDARD OF REVIEW

"This Court [] reviews de novo decisions on motions for summary disposition brought under MCR 2.116(C)(10)." *Pace v Edel-Harrelson*, 499 Mich 1, 5; 878 NW2d 784 (2016). A motion for summary disposition pursuant to MCR 2.116(C)(10) "tests the factual sufficiency of the complaint." *Joseph v Auto Club Ins Assoc*, 491 Mich 200, 206; 815 NW2d 412 (2012). "In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion."

*Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). Summary disposition is proper where there is no "genuine issue regarding any material fact." *Id*. "A reviewing court may not employ a standard citing the mere possibility that the claim might be supported by evidence produced at trial. A mere promise is insufficient under our court rules." *Bennett v Detroit Police Chief*, 274 Mich App 307, 317; 732 NW2d 164 (2006). "Trial court rulings regarding equitable matters are also reviewed de novo." *Karaus v Bank of NY Mellon*, 300 Mich App 9, 22-23; 831 NW2d 897 (2012). The trial court's interpretation of the prenuptial agreement, like a contract, is an issue of law that this Court reviews de novo. *Sweebe v Sweebe*, 474 Mich 151, 154; 712 NW2d 708 (2006).

## B. APPLICABLE LAW

"[I]t is now well established that prenuptial agreements governing the division of property in the event of a divorce are recognized in Michigan." *Reed v Reed*, 265 Mich App 131, 142; 693 NW2d 825 (2005), citing MCL 557.28 ("A contract relating to property made between persons in contemplation of marriage shall remain in full force after marriage takes place."). "A court should never disregard a valid prenuptial agreement, but should instead enforce its clear and unambiguous terms as written." *Woodington v Shokoohi*, 288 Mich App 352, 372; 792 NW2d 63 (2010). "[P]renuptial agreements are contracts subject to the rules governing construction of contracts generally." *Reed*, 265 Mich App at 149. This Court in *Woodington*, 288 Mich App at 373-374 (citations and quotation marks omitted), summarized the principles of contract interpretation in the context of prenuptial agreements:

> A contract must be interpreted according to its plain and ordinary meaning. A contract is ambiguous if it allows two or more reasonable interpretations, or if the provisions cannot be reconciled with each other. Under ordinary contract principles if contractual language is clear, construction of the contract is a question of law for the court. If the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous. A court may not rewrite clear and unambiguous language under the guise of interpretation. Rather, courts must give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory.

In analyzing the prenuptial agreement, this Court's and the trial court's function was "to determine what the agreement is and enforce it," by referring to the unambiguous language thereof. *Reed*, 265 Mich App at 144 (quotation marks omitted).

## C. ANALYSIS

Plaintiff argues the trial court misinterpreted the plain and unambiguous language of the prenuptial agreement by ruling that defendant's income from Silverman & Morris, and his subsequent investment of those funds, remained his separate property. The prenuptial agreement provided that plaintiff "shall not acquire by reason of the contemplated marriage . . . any interest in [defendant's] property or estate, or the right to any interest in the income, increase, rents, profits, dividends, proceeds or any subsequent reinvestment therefrom . . . ." The agreement described defendant's "property or estate" as those assets "identified in Exhibit B," which would

"remain and be his separate property, subject entirely to his individual control and use, the same as if he were unmarried . . . ." The parties' agreement further defined what it meant by "separate property" by establishing that it "shall also include any and all businesses, successor businesses, partnership, joint ventures, stock in corporations, retirement accounts, investments accounts, or the exchange of any asset for another." It is undisputed that defendant disclosed his interest in Silverman & Morris, as well as a variety of other investment and retirement accounts. While the names of the accounts might have changed between the signing of the prenuptial agreement and the divorce, the agreement was clear that it covered "the exchange of any asset for another," and defendant provided an unrebutted affidavit that his accounts all were comprised of rollovers, deposits, and exchanges arising out of his separate assets.

Plaintiff does not dispute that defendant's share of his firm and the values of his various accounts, to the extent that they accumulated passively from investment or interest rates, remained his separate property under the prenuptial agreement. Plaintiff contends, however, that defendant's earned income from Silverman & Morris was not a separate asset, and his investments of that money needed to be tracked through his various accounts to properly distribute them as part of the marital estate. Plaintiff is incorrect because the language of the prenuptial agreement was broad and specific regarding the extent of separate property. The most relevant portion of the prenuptial agreement provides that "separate property will include *all sums earned* as a result of the separate asset of either party subsequent to their marriage to the extent that these earnings are kept separate and not commingled into the marital estate as hereinafter defined." (Emphasis added). Notably, in defining the extent of separate property, the parties chose to use the word "all" when describing the "sums earned as a result of the separate asset of either party subsequent to their marriage . . . ." This Court has held that "there cannot be any broader classification than the word 'all,' and 'all' leaves room for no exceptions." *Peters v Gunnell, Inc*, 253 Mich App 211, 223; 655 NW2d 582 (2002). In defendant's unrebutted affidavit attached to his motion for summary disposition, he noted that all of his income came from disbursements from Silverman & Morris. Thus, defendant's income consisted of "all sums earned" from Silverman & Morris, his separate asset. Plaintiff wishes to narrow the definition of "all" to mean only passive appreciation of assets, and not the disbursements made as earned income. However, the use of the word "all sums earned" is clear and unambiguous and we are, and the trial court was, bound to enforce it. *Reed*, 265 Mich App at 144.

The prenuptial agreement provided that the only way for defendant to convert those separate assets into marital assets was "to commingle [them] by placing them in bank and/or brokerage accounts as joint tenants with full rights of survivorship or by taking title to property, both real and personal, as joint tenants or by the entireties . . . ." It is undisputed that defendant never commingled his investment accounts, retirement accounts, or bank accounts. Instead, defendant deposited certain income on a monthly basis into the marital bank account, which funds were then used to pay bills. Defendant acknowledged that the funds placed in that jointly owned account were marital. Plaintiff's suggestion that the other assets, even though held in accounts titled solely in defendant's name, also were marital to the extent that they actively appreciated by investment of earnings during the course of the marriage is in direct contrast with the clear and unambiguous language of the prenuptial agreement. Thus, plaintiff's position is without merit and the trial court properly granted summary disposition in favor of defendant regarding his separate property. See *Woodington*, 288 Mich App at 373-374.

As an alternative argument, plaintiff contends that the trial court should have used its equitable power to look beyond the prenuptial agreement and deemed those assets to be marital. Plaintiff is correct that prenuptial agreements can be deemed unenforceable under certain circumstances. "Generally, contracts between consenting adults are enforced according to the terms to which the parties themselves agreed." *Lentz v Lentz*, 271 Mich App 465, 471; 721 NW2d 861 (2006). "But some contracts, such as antenuptial agreements, are not simply enforced as written because our courts historically sought to protect what the courts regarded as the 'weaker' party to these agreements." *Id*. Thus, "such agreements may be voided if certain standards of fairness are not satisfied." *Reed*, 265 Mich App at 142 (quotation marks omitted), citing *Rinvelt v Rinvelt*, 190 Mich App 372, 380-381; 475 NW2d 478 (1991).

Prenuptial agreements "may be voided (1) when obtained through fraud, duress, mistake, or misrepresentation or nondisclosure of material fact, (2) if it was unconscionable when executed, or (3) when the facts and circumstances are so changed since the agreement was executed that its enforcement would be unfair and unreasonable." *Reed*, 265 Mich App at 142-143. "Finally, where the agreement is challenged, the burden of proof and persuasion is on the party challenging its validity." *Rinvelt*, 190 Mich App at 379, citing *In re Benker's Estate*, 416 Mich 681, 684; 331 NW2d 193 (1982).

Plaintiff does not rely on the three separate potential reasons provided for voiding the prenuptial agreement in *Reed*, 265 Mich App at 142-143. Instead, plaintiff relies entirely on this Court's recent opinion in *Allard v Allard (On Remand)*, 318 Mich App 583; 899 NW2d 420 (2017). Plaintiff misconstrues this Court's holding in *Allard*. To wit, the panel in *Allard*, 318 Mich App at 600-601, did not hold that a court, under the guise of equity, can redefine the terms of a prenuptial agreement to make the agreement more equitable. Instead, the *Allard* Court held that a trial court has the statutory power under MCL 552.23(1) and MCL 552.401 to invade separate assets to ensure an equitable distribution of property. *Allard*, 318 Mich App at 600-601. Thus, the trial court properly declined plaintiff's request to redefine defendant's separate property as marital property, because *Allard* provides no authority to do so. *Id*.

## III. PROPERTY DIVISION

Defendant argues that the trial court erred in distributing the marital estate when it ignored the prenuptial agreement. We agree.

### A. STANDARD OF REVIEW & GENERAL LAW

"We consider 'the trial court's findings of fact under the clearly erroneous standard. If the findings of fact are upheld, [we] must decide whether the dispositive ruling was fair and equitable in light of those facts.' " *Richards v Richards*, 310 Mich App 683, 693; 874 NW2d 704 (2015), quoting *Sparks v Sparks*, 440 Mich 141, 151-152; 485 NW2d 893 (1992). "The trial court's dispositional ruling will be upheld, unless this Court is 'left with the firm conviction that the division was inequitable.' " *Richards*, 310 Mich App at 694, quoting *Sparks*, 440 Mich at 152.

"The goal behind dividing marital property is to reach an equitable distribution in light of all the circumstances." *Washington v Washington*, 283 Mich App 667, 673; 770 NW2d 908

(2009). In other words, "[a]lthough marital property need not be divided equally, it must be divided equitably in light of a court's evaluation of the parties' contributions, faults and needs." *Richards*, 310 Mich App at 694. The Michigan Supreme Court provided a list of factors "to be considered wherever they are relevant to the circumstances of the particular case:"

> (1) duration of the marriage, (2) contributions of the parties to the marital estate, (3) age of the parties, (4) health of the parties, (5) life status of the parties, (6) necessities and circumstances of the parties, (7) earning abilities of the parties, (8) past relations and conduct of the parties, and (9) general principles of equity. [*Sparks*, 440 Mich at 159-160.]

"When dividing marital property, a trial court may also consider additional factors that are relevant to a particular case," and "[t]he trial court must consider all relevant factors but not assign disproportionate weight to any one circumstance." *Berger*, 277 Mich App at 717 (quotation marks omitted). "And, as a corollary to that, there is no Michigan statute or caselaw that precludes outright a substantial deviation from numerical equality in a property distribution award." *Washington*, 283 Mich App at 673. "In addition, this Court defers to a trial court's findings of fact stemming from credibility determinations." *Richards*, 310 Mich App at 694.

## B. APPLICABLE LAW & ANALYSIS

The trial court erred in distributing the marital estate without referencing or relying on the prenuptial agreement. "A court should never disregard a valid prenuptial agreement, but should instead enforce its clear and unambiguous terms as written." *Woodington*, 288 Mich App at 372. Instead, a trial court's function is "to determine what the agreement is and enforce it," by referring to the unambiguous language thereof. *Reed*, 265 Mich App at 144 (quotation marks omitted). Before trial, the court granted summary disposition in favor of defendant, holding that "the [prenuptial agreement] is clearly and unambiguously worded and that the parties purposefully entered into it . . . ." The agreement provides that "[t]he parties specifically agree that the property settlement to be included in any judgment dissolving their marriage shall award all separate property to its owner with jointly owned property divided as equally as may be accomplished."

The property in contention during trial was the marital home, the Taylor Account, furnishings and furniture in the marital home, five photographs by Lik, four pieces of sports memorabilia, and four Tumi suitcases. The trial court, without citation to the prenuptial agreement with regard to any of the contested pieces of property, provided a distribution of the marital estate that was not equal. Instead, the trial court relied solely on its findings of fact and their application to the *Sparks* factors to determine what it believed to be an equitable and just distribution of the estate. In doing so the trial court committed error because it was not permitted to simply disregard the prenuptial agreement and resort to equitable considerations without any analysis as to why it was doing so. See *Woodington*, 288 Mich App at 372.

There are limited circumstances where a trial court may set aside a prenuptial agreement. Prenuptial agreements "may be voided (1) when obtained through fraud, duress, mistake, or misrepresentation or nondisclosure of material fact, (2) if it was unconscionable when executed, or (3) when the facts and circumstances are so changed since the agreement was executed that its

enforcement would be unfair and unreasonable." *Reed*, 265 Mich App at 142-143. The trial court made no findings of fact or conclusions of law regarding these possible reasons that would allow it to ignore the prenuptial agreement. Consequently, the trial court entirely disregarded the prenuptial agreement and proceeded under the guise of equity in distributing the estate without first having concluded that the prenuptial agreement was void for one of the listed reasons. This was improper. *Woodington*, 288 Mich App at 372.

The prenuptial agreement had several relevant provisions that the trial court should have considered. With regard to the marital home, the prenuptial agreement reflected that "in the event [plaintiff] is required to invade her [investment account] . . . for any construction renovations to the parties primary residence or to assist in the purchase [of] a new home for the parties, these funds shall be deemed [plaintiff's] sole and separate property." In calculating the equity in the home, the trial court did award plaintiff's $125,000 investment as a separate asset, which was proper under the prenuptial agreement, but the trial court did not cite the agreement in doing so. The trial court found that, despite defendant's testimony to the contrary, plaintiff actually did invest the entire $125,000 into the marital home. The trial court found plaintiff's testimony and documentary evidence to be more credible than defendant's testimony. Similarly, the trial court believed plaintiff's expert witness that the marital home properly was valued at $470,000, citing inconsistencies in defendant's expert's valuation of $500,000. "[T]his Court defers to a trial court's findings of fact stemming from credibility determinations." *Richards*, 310 Mich App at 694. The trial court, therefore, did not clearly err in calculating the equity in the home as $59,811.55 by deducting the remaining value on the mortgage and plaintiff's $125,000 investment from the $470,000 value of the home. *Id*. However, in the judgment of divorce, the trial court awarded plaintiff the entire marital home, without any recompense to defendant for his share of the equity or discussion of the prenuptial agreement's clause stating that marital assets are to be "divided as equally as may be accomplished."

Regarding the personal property remaining in the marital home, which included the Lik photographs, sports memorabilia, Tumi suitcases, and remaining furniture and furnishings, the prenuptial agreement reflected the parties' mutual assent "that should they purchase furniture and furnishings for" the marital home "subsequent to the marriage, that those items shall be considered joint property of the parties." The trial court did not analyze exactly what furniture would be considered joint property under the prenuptial agreement, noting only that the Lik photographs were hung in the marital home, even if purchased with defendant's own funds, so they were properly considered marital assets. While that determination was not necessarily incorrect, with the prenuptial agreement referencing post-nuptial purchases of "furniture and furnishings" as joint property, the trial court should have considered it when resolving this issue. Relevant to this determination is whether the Lik photographs were properly considered furnishings or, as proposed by defendant, they were investments purchased with "sums earned" from his separate property and thus, not unlike his retirement and investment accounts, separate assets. With regard to the other pieces of personal property remaining in the marital home, the parties agreed that they were joint property. The trial court's distribution of the marital estate, however, also included the furniture and furnishings in defendant's new apartment. Nevertheless, the trial court did not analyze whether those were defendant's separate property, as they were not commingled in the marital home and were purchased with defendant's separate property, or whether they were post-marital furniture and furnishings under the prenuptial agreement.

With respect to the Taylor Account, the trial court awarded the sum total to plaintiff, determining that it would be unjust and inequitable to do otherwise. The trial court, once again, failed to analyze the prenuptial agreement to determine whether that account was the joint property of the parties. The agreement provided that "the parties may elect to commingle their assets by placing them in bank and/or brokerage accounts as joint tenants with full rights of survivorship or by taking title to property, both real and personal, as joint tenants or by the entireties . . . ." Pursuant to this, the trial court should have focused on the effect the prenuptial agreement would have on the ownership of the Taylor Account. The trial court could support awarding the entire account to plaintiff if it were to determine that the entire account was funded by Taylor's social security payments and gifts to her.

On remand, the trial court should begin by considering whether the Lik photographs, defendant's apartment furnishings and furniture, and the Taylor Account are separate or marital property under the prenuptial agreement. After determining that, the trial court should then follow the agreed upon terms of the prenuptial agreement to award the separate property to the relevant party and then divide the jointly owned property "as equally as may be accomplished." In doing so, the trial court will be enforcing the prenuptial agreement's "clear and unambiguous terms as written," as it was required to do. *Woodington*, 288 Mich App at 372.

While the trial court pronounced its belief that its distribution was *equitable*, it did not, in any manner, find that splitting the marital property "as equally as may be accomplished" under the terms of the prenuptial agreement was *inequitable*. *Id*. It was required to do so under *Allard* if the trial court wished to look beyond the prenuptial agreement and make an equitable distribution of the estate. Further, in determining whether the prenuptial agreement was inequitable, it is of substantive concern that plaintiff suggested the prenuptial agreement, protected her separate assets that were larger than defendant's before marriage, and relied on the advice of her attorney before signing the document. Those factors are not irrelevant in determining whether it would be equitable to enforce the agreement as written. See *Reed*, 265 Mich App at 142-143.

We vacate the relevant portions of the trial court's judgment regarding distribution of the estate and remand for further proceedings consistent with this opinion.

## IV. SPOUSAL SUPPORT

Defendant argues that the trial court clearly erred in finding a variety of facts and entered an inequitable spousal support award. Because an award of spousal support necessarily relies on the property distributed to the parties, which the trial court erred in doing, we also vacate the trial court's spousal support award.

### A. STANDARD OF REVIEW & APPLICABLE LAW

"Whether to award spousal support is in the trial court's discretion, and we review the trial court's award for an abuse of discretion." *Gates v Gates*, 256 Mich App 420, 432; 664 NW2d 231 (2003). "An abuse of discretion occurs when a court selects an outcome that is not within the range of reasonable and principled outcomes." *Carlson v Carlson*, 293 Mich App 203, 205; 809 NW2d 612 (2011). This Court is first required to review the trial court's findings

of fact for clear error. *Woodington*, 288 Mich App at 355. "A finding is clearly erroneous if, after reviewing the entire record, we are left with the definite and firm conviction that a mistake was made." *Loutts v Loutts*, 298 Mich App 21, 26; 826 NW2d 152 (2012). "If the trial court's findings of fact are upheld, the appellate court must decide whether the dispositive ruling was fair and equitable in light of those facts." *Woodington*, 288 Mich App at 355. "The trial court's decision regarding spousal support must be affirmed unless we are firmly convinced that it was inequitable." *Gates*, 256 Mich App at 433.

"The object in awarding spousal support is to balance the incomes and needs of the parties so that neither will be impoverished; spousal support is to be based on what is just and reasonable under the circumstances of the case." *Berger v Berger*, 277 Mich App 700, 726; 747 NW2d 336 (2008). This Court has provided a list of 14 factors that a trial court should consider when determining if spousal support is proper in a given case:

> (1) [T]he past relations and conduct of the parties; (2) the length of the marriage; (3) the abilities of the parties to work; (4) the source and the amount of property awarded to the parties; (5) the parties' ages; (6) the abilities of the parties to pay support; (7) the present situation of the parties; (8) the needs of the parties; (9) the parties' health; (10) the parties' prior standard of living and whether either is responsible for the support of others; (11) the contributions of the parties to the joint estate; (12) a party's fault in causing the divorce; (13) the effect of cohabitation on a party's financial status; and (14) general principles of equity. [*Woodington*, 288 Mich App at 356.]

## B. ANALYSIS

Typically, the first step in this Court's analysis is to determine whether the trial court made any clearly erroneous factual findings. *Id*. at 355. However, of particular relevance in this appeal is the fourth factor cited in *Woodington*, which requires the trial court to consider "the source and amount of property awarded to the parties." *Id*. at 356. As discussed, *supra*, the trial court committed error requiring reversal when it distributed the marital estate without reference to or analysis of the prenuptial agreement. Therefore, on remand, the trial court will reevaluate its property distribution. Defendant asserts that the trial court made a variety of clearly erroneous factual findings unrelated to the distribution of property. Considering those same factors and factual findings will be relevant on remand but, in the interest of judicial economy, we will consider those arguments in this appeal.

The first factor required the trial court to consider "the past relations and conduct of the parties . . . ." *Id*. The trial court found that defendant committed a great deal of misconduct toward the end of the marriage and during the divorce proceeding. First, the trial court found that defendant acted inappropriately by preparing himself ahead of time for the divorce by moving money from his bank accounts to investment accounts after beginning to see Schlesinger, paying off a year's worth of marital bills, and renting an apartment. The trial court believed that plaintiff moved the money between accounts "in an attempt to maximize his personal financial gain." Defendant argues that these findings were clearly erroneous because they all involved defendant's separate assets so he could do with them as he pleased. Defendant, however, misunderstands the trial court's finding of misconduct. The trial court never found that

defendant did those things in violation of the prenuptial agreement or any laws, but merely that defendant committed misconduct by preparing for his divorce well in advance of telling plaintiff. That finding was supported by the record. Further, the trial court found that defendant moved his money between accounts "in an attempt to maximize his personal financial gain" in the event of divorce. Defendant's contention that the money was his anyway misses the point. The trial court merely was noting that, at the time, defendant moved money from a bank account to an investment account that defendant believed, before any summary disposition order was entered declaring those to be defendant's separate property, was a safer haven to keep his money from plaintiff. While that ended up not being necessary considering the trial court's interpretation of the prenuptial agreement, it does not change the fact that defendant's intent was less than honorable, and we are not "left with the definite and firm conviction that a mistake was made" by the trial court on this issue. *Loutts*, 298 Mich App at 26.

Also in regard to the first factor, the trial court found that the defendant's misconduct continued when he cut off plaintiff's access to his credit card that she regularly used during the course of the marriage, stopped making deposits in the marital bank account which plaintiff needed to pay bills, and purposely depleted that account by paying bills out of it. Defendant contends that the trial court clearly erred in finding, based on those facts, that plaintiff was left without means to support herself, asserting instead that plaintiff had sufficient investments to survive. However, defendant himself testified at trial that he paid all of the marital bills, plaintiff regularly used the credit cards in his name, and he paid those bills off monthly without question. Furthermore, plaintiff testified that she never was required to invade her investments to pay for her daily life or the marital bills. Thus, the trial court did not clearly err in finding that defendant's conduct was inappropriate under the status quo of the marriage. *Id.*

Additionally, the trial court contemplated misconduct from defendant when he left plaintiff one day after her surgery, and smirked and smiled throughout his testimony. Defendant asserts that the trial court clearly erred in finding those facts because he testified that plaintiff was up and around the day after her minor surgery and he did not think anything about the trial was funny. However, plaintiff's testimony at trial reveals that she was upset that defendant would choose to leave immediately following a surgery, regardless of the nature thereof, and, having reviewed the entire record, the trial court transcript contains several instances where the trial court or plaintiff's attorney note that defendant is smiling or smirking at them. The factfinder is best suited to consider a witness's credibility and demeanor, so this Court will rely on the trial court's determinations regarding plaintiff's emotional reaction to defendant's exit from the marriage and his conduct during trial. *Smith v Anonymous Joint Enterprise*, 487 Mich 102, 130; 793 NW2d 533 (2010).

Lastly, with respect to the first factor, the trial court found that defendant used discovery inappropriately by subjecting plaintiff to two days of deposition. The trial court believed plaintiff's testimony and that the depositions, regardless of their length and questioning, amounted to a form of harassment of plaintiff, especially given the nonsensical subject of some of the questions. The trial court did not clearly err because "this Court defers to a trial court's findings of fact stemming from credibility determinations." *Richards*, 310 Mich App at 694.

The parties do not dispute that the length of the marriage was 12 years, which is the second spousal support factor. *Woodington*, 288 Mich App at 356. The third factor required the

trial court to consider the abilities of the parties to work. *Id*. The trial court found that defendant was the majority shareholder in his law firm, his income varied year-to-year based on several factors, and that the extent of his decrease in the recent years was likely due to defendant's decision to spend portions of workdays at Schlesinger's house. In reaching those findings, the trial court relied on testimony from defendant and Schlesinger that defendant would come to her house during the day because he needed to be home at night and on weekends to avoid plaintiff's suspicions. Thus, the trial court did not clearly err because the record supports the trial court's finding that defendant's income was reduced partially due to his affair. See *Loutts*, 298 Mich App at 26.

The trial court also addressed plaintiff's ability to work in regard to the third factor. *Woodington*, 288 Mich App at 356. It found that plaintiff was qualified to work as a social worker, given her licensing and master's degree in social work, but the trial court "also [found] it unlikely that [p]laintiff will obtain such a job given her age and lengthy absence from the field." In so deciding, the trial court relied on plaintiff's testimony that she had looked for employment in such a position but had not heard back on any of her applications, and the testimony defendant's expert witness that it would take a significant amount of time for plaintiff to find such a job and then an additional five years to reach a median salary. The trial court found that plaintiff had the ability to remain in her job as a leasing agent. Because that conclusion was supported by the evidence admitted at trial, the trial court did not clearly err in so finding. See *Loutts*, 298 Mich App at 26.

The fourth factor, the source and amount of property awarded, was addressed, *supra*, and the fifth factor, the parties' ages, was not disputed by either party. *Woodington*, 288 Mich App at 356. The sixth factor required the trial court to consider "the abilities of the parties to pay support . . . ." *Id*. The trial court began by noting the testimony presented by Justin Cherfoli and Bruce Knapp, the financial experts called by each party regarding defendant's income. After considering that testimony, the trial court made the following findings:

> The Court finds that Mr. Cherfoli's opinion, in which he contended that the Court should set Defendant's income at $360,000, is a more accurate portrayal of Defendant's earnings than Mr. Knapp's opinion that Defendant's income should be set at $281,493. The Court's finding is based on numerous factors, including Mr. Cherfoli's decision to consider Defendant's income for the entire length of the parties' marriage. The Court notes that doing so was fair and equitable given the fluctuation of the market conditions and the volatility of the Firm. The Court also finds that Mr. Cherfoli's analysis of Defendant's income is a more accurate reflection of what Defendant earns on any given year because it accounted for any and all money that Defendant actually received.

In essence, the trial court believed plaintiff's expert witness, Cherfoli, over defendant's expert witness, Knapp. In reaching this conclusion, the trial court took into account an anomalous income that defendant insisted was unlikely to recur, noting that Cherfoli's analysis of the 12-year average based on the length of the marriage took into account all of defendant's income, which necessarily included some anomalies. The trial court determined that this was the most telling manner in which to analyze defendant's fluctuating income. We will not second guess the trial court's determination that Cherfoli's testimony and evidence was more credible than

defendant's testimony, so the trial court did not clearly err in determining defendant's income at $360,000 and finding he had the ability to pay spousal support. *Richards*, 310 Mich App at 694.[1]

The seventh factor considered by the trial court was "the present situation of the parties . . . ." *Woodington*, 288 Mich App at 356. The trial court found that defendant was "a successful attorney with a majority share" in Silverman & Morris, had a furnished apartment, was dating Schlesinger, and regularly went on trips with her. Meanwhile, plaintiff held a low-paying job and was depressed due to defendant's affair. Those findings were supported by the testimony introduced at trial and were not clearly erroneous. See *Loutts*, 298 Mich App at 26.

The trial court was next required to consider "the needs of the parties . . . ." *Woodington*, 288 Mich App at 356. It accepted as true plaintiff's testimony that she required between $11,750 to $12,500 per month to pay her expenses and that those expenses were not unreasonable "given the parties' lifestyle during their 12-year marriage." Defendant contends that the trial court clearly erred for believing her testimony, which was based on her calculations from the bills paid during the year preceding her testimony, instead of his testimony that she was a frivolous spender. Defendant essentially is asking us to believe him instead of plaintiff, but we will not readdress the parties' credibility as that is within the province of the trial court. *Richards*, 310 Mich App at 694.

The ninth *Woodington* factor was the health of the parties. The trial court found that plaintiff had hearing loss due to surgery and suffered from depression, while defendant was diagnosed with lymphoma, previously had been treated with radiation, but had fully recovered and was able to work. Those findings were supported by the testimony of both plaintiff and defendant at trial, and defendant did not submit any medical record evidence to the contrary. Thus, the trial court did not clearly err in making those findings of fact. See *Loutts*, 298 Mich App at 26.

In addressing the health of the parties, the trial court also found that defendant did not plan to retire. The record shows that plaintiff was asked if she and defendant "talked about him retiring at age 65," to which she responded, "[h]e had talked about wanting to and I never was onboard with that." Upon reviewing the entire record, there was no testimony provided by plaintiff or defendant that defendant never planned to retire, only that plaintiff did not want him to do so. Therefore, by specifically finding that defendant never announced a plan to retire, the trial court mischaracterized the testimony and clearly erred. See *Loutts*, 298 Mich App at 26. On remand, the trial court should reconsider this issue in reassessing spousal support.

---

[1] Defendant also asserts that the trial court failed to take into account the testimony of Thomas Morris, defendant's partner, that the firm was struggling. However, Morris also testified that despite the general downward trend of the firm, defendant's billable hours had decreased dramatically more than any other associate or Morris himself. Cherfoli also testified that given defendant's status as a partner, he could shield his income by just declining to take distributions from the firm. Thus, the trial court did not necessarily disregard Morris's testimony that the firm had a recent downward trend, but merely believed Cherfoli that defendant was likely hiding his income due to the divorce. Such was not clear error. *Richards*, 310 Mich App at 694.

For the tenth factor, the trial court considered "the parties' prior standard of living and whether either is responsible for the support of others . . . ." *Woodington*, 288 Mich App at 356. Defendant contends that the trial court's decision to rely on plaintiff's proposed budget was clearly erroneous. Defendant argues that the budget was prepared based on bills paid and money spent when plaintiff's children and defendant still lived in the marital home, which no longer was the case. However, plaintiff testified that she based her budget on the bills paid for the year preceding her testimony. She testified to that budget more than nine months after defendant moved out of the house and more than six months after Taylor left for college. Consequently, plaintiff's budget primarily took into account times when she lived alone in the marital home. Thus, defendant's assertion is without merit and the trial court did not clearly err in relying on plaintiff's proposed budget. See *Loutts*, 298 Mich App at 26.

The eleventh spousal support factor required the trial court to consider "the contributions of the parties to the joint estate . . . ." *Woodington*, 288 Mich App at 356. The trial court found that plaintiff contributed $125,000 of her separate assets to the marital home and that defendant "regularly contributed to the parties' joint estate during the marriage, however, by independently supporting the parties financially." Defendant contends that the trial court clearly erred by failing to take into account that he paid the mortgage. However, the trial court's findings of fact clearly and explicitly note that defendant paid all of the marital bills—which necessarily included the mortgage—and thereby contributed to the marital estate. Therefore, defendant's contention is without merit and the trial court did not clearly err in its findings of fact. See *Loutts*, 298 Mich App at 26.

Defendant contends that the trial court clearly erred in determining the twelfth *Woodington* spousal support factor, fault causing the divorce, by focusing solely on defendant's misdeeds. In finding defendant at fault for causing the divorce, the trial court relied on the testimony of plaintiff, defendant, and Schlesinger that defendant had an affair during the last year of the marriage. The trial court noted defendant's testimony that plaintiff was also at fault for causing the divorce because she still harbored feelings for her deceased ex-husband, plaintiff's attitude toward defendant, and their alleged incompatibility. The trial court, however, disagreed with defendant and found that his "participation in the extramarital affair . . . caused the breakdown of the marriage." We refuse to reassess the witnesses' credibility on this issue. *Richards*, 310 Mich App at 694. Thus, the trial court did not clearly err in determining that defendant was at fault for causing the divorce. See *Loutts*, 298 Mich App at 26.

The parties do not disagree that the thirteenth factor, "the effect of cohabitation on a party's financial status," was irrelevant in the instant case. *Woodington*, 288 Mich App at 356. For the last factor, the trial court considered "general principles of equity." *Id*. Defendant asserts that the trial court clearly erred in finding that plaintiff was in a substantially worse financial situation than defendant. Defendant contends this was error because it ignored that defendant did not cause plaintiff's financial situation. However, the trial court did not find that defendant caused the financial disparity—only that it existed. As such, defendant's contention is without merit and the trial court did not clearly err in its finding of fact. See *Loutts*, 298 Mich App at 26. Defendant also contends that the trial court set his income at an inappropriately high level. That argument was addressed, *supra*, and found to be without merit. Consequently, defendant's contention is without merit and the trial court did not clearly err in its finding of fact. See *id*.

In sum, the trial court's findings of fact were not clearly erroneous. However, as discussed, *supra*, the fourth factor, the source and amount of property awarded to the parties, requires reconsideration after the trial court properly distributes the parties' property upon application of the prenuptial agreement. Consequently, while affirming all but one of the trial court's factual findings, we vacate the spousal support portion of the judgment of divorce and remand for it to be recalculated by the trial court after readdressing the distribution of the marital estate.

## V. ATTORNEY FEES

Defendant argues that the trial court abused its discretion by ordering him to pay plaintiff's attorney and expert witness fees. We disagree.

### A. STANDARD OF REVIEW & APPLICABLE LAW

"This Court reviews a trial court's decision to award attorney fees in a divorce action for an abuse of discretion." *Woodington*, 288 Mich App at 369. "An abuse of discretion occurs when the result falls outside the range of principled outcomes." *Richards*, 310 Mich App at 699. "The findings of fact on which the trial court bases its decision are reviewed for clear error." *Woodington*, 288 Mich App at 369. "A finding is clearly erroneous if we are left with a definite and firm conviction that a mistake has been made." *Richards*, 310 Mich App at 700 (quotation marks omitted).

"Under the 'American rule,' attorney fees are not recoverable as an element of costs or damages unless expressly allowed by statute, court rule, common-law exception, or contract." *Reed*, 265 Mich App at 164. "In domestic relations cases, attorney fees are authorized by both statute, MCL 552.13, and court rule, MCR 3.206(C)." *Reed*, 265 Mich App at 164. "A party to a divorce action may be ordered to pay the other party's reasonable attorney fees if the record supports a finding that such financial assistance is necessary to enable the other party to defend or prosecute the action." *Borowsky*, 273 Mich App at 687, quoting *Stackhouse v Stackhouse*, 193 Mich App 437, 445; 484 NW2d 723 (1992). Stated differently, "[e]ither by statute or court rule, attorney fees in a divorce action may be awarded only when a party needs financial assistance to prosecute or defend the suit." *Reed*, 265 Mich App at 164. There also is a common law exception to the "American rule," authorizing "[a]n award of legal fees . . . where the party requesting the fees has been forced to incur them as a result of the other party's unreasonable conduct." *Borowsky*, 273 Mich App at 687. See also *Reed*, 265 Mich App at 164-165. In either case, "[t]he party requesting the attorney fees has the burden of showing facts sufficient to justify the award." *Borowsky*, 273 Mich App at 687.

### B. ANALYSIS

Defendant argues on appeal that the trial court erred because plaintiff could afford to pay her own attorney fees. In support of that argument, defendant cites to plaintiff's investment accounts and other separate assets totaling over $1 million. Defendant is correct that "attorney fees in a divorce action may be awarded only when a party" cannot afford to litigate the suit. *Reed*, 265 Mich App at 164. However, "[i]t is well settled that a party should not be required to invade assets to satisfy attorney fees when the party is relying on the same assets for support."

*Gates*, 256 Mich App at 438. "Further, a party sufficiently demonstrates an inability to pay attorney fees when that party's yearly income is less than the amount owed in attorney fees." *Myland v Myland*, 290 Mich App 691, 702; 804 NW2d 124 (2010).

The trial court found that, in order to pay her attorney fees, plaintiff would be required to invade her separate assets, on which she is relying for support considering her income was only $12,000 to $14,000 per year. Defendant's assertion that the trial court clearly erred in calculating plaintiff's income was addressed, *supra*, and found to be without merit. Meanwhile, the trial court also found that plaintiff accrued $57,616.27 in attorney fees throughout the trial. In reaching that number, the trial court referenced invoices submitted by plaintiff as evidence and plaintiff's testimony that she was contractually obligated to pay those fees. Further, the trial court determined that the fees were reasonable, relying on plaintiff's testimony that she reviewed the documents and all of the work was performed and reasonably necessary. The trial court also relied heavily on the fact that the attorney fees, which totaled $83,488.37 as originally priced, were reduced by a significant family discount given that plaintiff's sister represented her. The trial court also determined that the expert witnesses' fees were reasonable and necessary, considering defendant's assertions that his income was reduced and that he was entitled to half of the Taylor Account.

Those facts were supported by evidence and testimony admitted at trial, and therefore, were not clearly erroneous. *Woodington*, 288 Mich App at 369.[2]

Thus, the trial court was presented with a record where plaintiff owed approximately $70,000 in attorney and expert fees, while earning a salary under $15,000. Consequently, plaintiff "sufficiently demonstrate[d] an inability to pay attorney fees" because her "yearly income is less than the amount owed in attorney fees." *Myland*, 290 Mich App at 702. In order to pay those fees, plaintiff would have had to invade her separate assets, which this Court has held is not proper when considering attorney fees. *Gates*, 256 Mich App at 438. Lastly, as discussed, *supra*, the trial court did not clearly err in calculating defendant's income at $360,000 per year. Plaintiff not only proved that she could not afford her attorney and expert fees, but that defendant could. MCR 3.206(C)(1).

Therefore, the trial court did not abuse its discretion in requiring defendant to pay the relevant fees. MCL 552.13(1); *Reed*, 265 Mich App at 164.

## VI. REMAND TO A DIFFERENT TRIAL JUDGE

---

[2] Defendant suggests that this Court should reverse because the trial court was required to hold a hearing to address the reasonableness of the various fees and to weigh the factors established by the Michigan Supreme Court in *Smith v Khouri*, 481 Mich 519, 529-530; 751 NW2d 472 (2008), and *Wood v DAIIE*, 413 Mich 573, 588; 321 NW2d 653 (1982). However, this Court has held that "[b]ecause an award of attorney fees under MCR 3.206(C)(2) has no relation to an award of attorney fees under MCR 2.403(O), we conclude that the trial court did not err by failing to follow the detailed procedure set forth in *Smith*." *Riemer v Johnson*, 311 Mich App 632, 657; 876 NW2d 279 (2015).

Defendant requests that this Court remand this case to a different trial judge because of the trial court's exhibited bias. We disagree.

## A. APPLICABLE LAW

The Michigan Supreme Court and this Court previously have remanded proceedings to a different judge so as to avoid the appearance of impropriety. See *Sparks*, 440 Mich at 163; see also *Kiefer v Kiefer*, 212 Mich App 176, 183; 536 NW2d 873 (1995). The question presented, essentially, is whether the trial court judge should be disqualified based on exhibited bias. "A trial judge is presumed to be fair and impartial, and any litigant who would challenge this presumption bears a heavy burden to prove otherwise." *In re Susser Estate*, 254 Mich App 232, 237; 657 NW2d 147 (2002). "A judge is disqualified when he cannot hear a case *impartially* . . . ." *Cain v Mich Dep't of Corrections*, 451 Mich 470, 494; 548 NW2d 210 (1996). "MCR 2.003(C) provides . . . grounds for disqualifying a judge[.]" *Butler*, 308 Mich App at 226. Pursuant to MCR 2.003(C)(1)(a), "[d]isqualification of a judge is warranted . . . [if] [t]he judge is biased or prejudiced for or against a party or attorney."

"An actual showing of prejudice is required before a trial judge will be disqualified." *In re Forfeiture of $1,159,420*, 194 Mich App 134, 151; 486 NW2d 326 (1992). "This requirement has been interpreted to mean that disqualification is not warranted unless the bias or prejudice is both personal and extrajudicial." *Cain*, 451 Mich at 495. Stated differently, "the challenged bias must have its origin in events or sources of information gleaned outside the judicial proceedings." *Id*. "Opinions formed by a judge on the basis of facts introduced or events occurring during the course of the current proceedings, or of prior proceedings, do not constitute bias or partiality unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Schellenberg v Rochester Mich Lodge No 2225 of the Benevolent & Protective Order of Elks*, 228 Mich App 20, 39; 577 NW2d 163 (1998).

## B. ANALYSIS

Defendant contends that the trial court judge exhibited bias by its "punitive focus on the issue of fault," and failure to appropriately apply the prenuptial agreement. However, the trial court's 37-page opinion after the bench trial addressed a variety of factors, one of which included fault. "[F]ault is clearly a proper factor to consider in the division of marital property," and spousal support. *Washington*, 283 Mich App at 675-676; *Woodington*, 288 Mich App at 356. The trial court's decision that defendant was at fault for causing the divorce and its erroneous misapplication of the prenuptial agreement are not reasons to find that the trial court exhibited bias. *Cain*, 451 Mich at 495; *Armstrong v Ypsilanti Charter Twp*, 248 Mich App 573, 597; 640 NW2d 321 (2001) (quotation marks omitted) ("[J]udicial rulings, in and of themselves, almost never constitute a valid basis for a motion alleging bias . . . ."). There is nothing in the record to suggest that, when faced with legal issues, the trial court is unable to set aside its personal opinion regarding fault. To wit, the trial court granted defendant's motion for summary disposition regarding his separate assets. As such, the record contains no evidence of "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Schellenberg*, 228 Mich App at 39.

Defendant also claims that the trial court exhibited bias by cutting off his examination and cross-examination of witnesses. The trial went on for 15 days, spanned eight months, and resulted in nearly 2,000 pages of transcript. "[T]he trial court's exercise of its discretion to control the proceedings . . . [cannot] generally be used to establish bias even if erroneous." *Huntington Nat'l Bank v Daniel J Aronoff Living Trust*, 305 Mich App 496, 517; 853 NW2d 481 (2014). Given the exorbitant length of the trial, the court was well within its bounds to curtail certain portions of the trial. "The record here simply does not establish that this case is one of those extreme cases warranting relief." *Id*.

Lastly, defendant claims that the trial court exhibited bias by calling plaintiff's counsel by her first name and its "exchanges with [] Schlesinger . . . ." Defendant does not explain how calling plaintiff's counsel by her first name exhibit bias against defendant. Further, defendant fails to identify the specific interactions with Schlesinger that defendant believes exhibited bias. Thus, not only is this assertion abandoned for a failure to adequately brief it, see *Rettig v Rettig*, 322 Mich App 750, 752; 912 NW2d 877 (2018), it also is without merit because "a trial judge's remarks, which are hostile to or critical of the parties, their cases, or their counsel, ordinarily will not establish a disqualifying bias," *Huntington Nat'l Bank*, 305 Mich App at 517. Having reviewed the entire record, it is clear that the trial court's interactions with plaintiff's attorney and Schlesinger "do[] not establish that this case is one of those extreme cases warranting relief." *Id*.

In sum, because defendant has not provided evidence that the trial court has "a deep-seated favoritism or antagonism that would make fair judgment impossible," we will not provide defendant's requested relief of remanding to a different trial court judge. *Schellenberg*, 228 Mich App at 39.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Kirsten Frank Kelly
/s/ Mark T. Boonstra